On behalf of Power Mart, Mr. Dean J. Brewery, on behalf of Pyramid, Ms. Cori Ballance. May it please the Court, Dean Lurie for the Appellant, Power Mart Real Estate Corporation. This appeal stems from an action by a general contractor, the Abilene, against the owner of property, the Appellant, for alleged extras performed on a construction contract. At trial, the parties did not dispute that the Appellant agreed to perform certain rehabilitation work for the Appellant on Appellant's property, a mini-market car wash, for the gross price of $100,000. Parties also did not dispute that the Appellant paid the sum in full after it received credits for work not completed. The dispute at trial was what was included in the scope of the agreement, the scope of work. The first alleged complaint alleged two counts, breach of an oral contract and mechanics in foreclosure. After a bench trial, the trial court awarded the Appellate the claimed extras in an amount of $34,100 on count one for breach of the oral contract. The trial court dismissed count two for mechanics in foreclosure. However, in its opinion, the trial court stated the following factual finding. The court stated, The main dispute is over what the plaintiff has denominated as extras to this oral contract and what the defendant has claimed as part of the scope of the work. I believe that the most credible testimony of this trial has been that of Mike Carrier. I think his testimony that Mr. Safe and Mr. O'Day had differing views of what the scope of the work was was absolutely correct. It's quite clear that Mr. Safe felt that the general scope of the work, as set forth in the plan he received, was what he was to do. Mr. O'Day believed his detailed specification was what the contract entailed. I believe that as such, there was no real meeting of the minds as to what this contract was to contain. And the court continued by stating that, excuse me, that was at the record at 510 through 511. The court continued as to count two when dismissing count two for mechanics in foreclosure stated, As to the issue of mechanics lien, I don't believe that there was a sufficient contract agreed to since, as I previously stated, there was not a meeting of the minds. So I don't believe that it is appropriate nor permissible for the court to enter a judgment on a mechanics lien. What's our standard of review on this case? This is a question of lawyer arm and the standard of review is de novo. For this particular issue, there are three independent ways. This was a trial, right? Correct. A bench trial. This is the first issue of three in which way the trial court erred. Despite finding there was no meeting of the minds in the scope of the construction contract, the court nonetheless awarded damages in count one for breach of an all contract, which is an inconsistent ruling when applying the facts to the law. No, you just read what the trial court said and as to count one, no meeting of the mind as to the scope of the contract. That's different than whether there was a contract. Correct, Your Honor. So that statement, you said it's in the statement. I don't believe it is. Well, Your Honor, Illinois law does provide that, and this is from Quinlan Verstappen, a fourth district case 2005. An enforceable contract must include a meeting of the minds to the terms of the contract. It is essential that in the minds of both parties there is an agreement on the essential terms and conditions. Whether a contract exists is a question for the trier of fact to determine. And the trier of fact, her testimony, if I recall, that the contractor was there, Carrie was there, Mr. Oda was there almost on a daily basis, that they would discuss things that came up. There was an agreement to do certain work on that property between the parties. It is the scope of that agreement that is at issue here. Absolutely. It is undisputed that the owner hired the contractor to do work for $100,000. So we have some sort of meeting of the minds that there is work to be done. Correct. And that work would be a rehabilitation of this property. Exactly what work specifically was to be agreed upon, the court found that there was a meeting of the minds specifically in the scope of work. Okay. So the trot court firstly erred as a matter of law when it awarded extras to a construction contract despite finding there was no meeting of minds in the scope of the underlying contract. Element courts have held on extras. A party seeking to recover for extras to a construction contract has the burden of proving by clear and convincing evidence five elements. The first element is most important here. The first element is that the work was outside the scope of the original contract. And that comes from Curran Contracting v. Woodland Hills, a second district case from 1992. So, therefore, if you want to prove extras, the first element is to prove that the extra work fell outside the scope of the underlying contract. And since the trot court found that there was no meeting of the minds in the scope of the underlying contract, the appellee cannot maintain that these items were actually extra and outside the scope of the underlying contract. Was there any proof by your client that there is some equipment available or some way that the contractor could have looked underground to find this electrical wire that wasn't there? Yes. One of the issues with one of the extras was electrical wiring, which the appellee stated at trial was kind of an unforeseeable circumstance. That was disputed at trial by the appellant. Testimony by Mike Curran, the project manager at trial, stated that if they had looked, they would have found that these wires were actually missing. The appellee stated there was no reason to look, that he assumed that those wires were actually there. But they looked where? There was ways to test to see if power was coming into the building. Right. Well, that's one thing.  Does that mean that the wires are gone so that there can't be power coming to the building? That is disputed. That was disputed at trial, whether that was foreseen or not. However, though, the foreseeability of an issue like that isn't really an element to prove extras. When there's no meeting of the minds as a scope, when a contractor says, I'm going to get the electrical running up in your building, and then starts for $10,000, just to use a hypothetical, and as work progresses, the contractor finds an unforeseen circumstance that maybe he thinks would cost a little bit more, he can't go back and ask for more money. Because he agreed to do the work for a set price. The fact that there was these unforeseen circumstances should have been negotiated up front. Did the track court look at these two, I don't know what, they're called kind of scope, proposed scope, the documents that the contractor had and that your client had? Yes, those were both evidence, and the trial court did in her finding state that one party believed that X was the scope and another party believed that Y was the scope. One was more specific than the other, but both were pretty general. And what was the, okay, that was going to be my next question. What was the difference in terms of the power underneath the building in the two proposed scopes that never were signed? Well, the, again, the more general scope, I believe, refers to the contractors. Correct. It refers to redoing electrical and bringing electrical service into the building, something of that sort, pretty ambiguous, not very specific. And what did Pyramid say? It was, again, it referred to something kind of general about bringing electrical into the building. There was nothing specific on that issue particularly. It was pretty much unknown at that point by any of the parties. Parties did agree that there was going to be new electrical service brought into the building, and that was pretty much undisputed. That was part of the original scope. Okay. What about the sidewalk reconstruction under the drive-in window? How is, what did the proposed scope say? Again, that particular item was not addressed, I believe, in either of the scopes. But it's disputed, correct, at trial? Correct. It's disputed that that was, that those items were an extra, that those items weren't included in this general scope of rehabilitating the property. You know, again, when you're talking general terms, you're not really sure what specifically those general terms include. So there were general terms about rehabilitation, doing certain concrete work, but nothing specific on those issues. In the original scope, did anyone contemplate a drive-in window? Yes, drive-in window was contemplated. An insulated drive-in window? Insulating windows? The insulation of the windows? Isn't it true that there's no dispute about the work being done? Correct. I mean, the windows were repaired, the roofers repaired, the electric wiring was brought in. No dispute about any of the work. No dispute that the contractor didn't do some of the landscaping and some of the other outside work. Correct. The work was done. Isn't this case really the contractor saying, I had discussions with the building owner at a point in time regarding a certain project, the cement, expanding the sidewalk, for instance. And the testimony of the contractor was that the owner agreed to expand the sidewalk. And then as they started that work, unforeseen circumstances arose because there was a big steel plate within the concrete, and it ended up that they had to put in a whole new sidewalk. Do you have any dispute that that was not a part of the original agreement, that that was an extra? Again, Your Honor, it's not a dispute that this work was requested and it was done. Okay? The question is, was that work included in the $100,000 or did the owner agree to pay extra for that work? The elements for extras, in addition, include that the owner either agreed expressly or impliedly to pay extra. The extra work was ordered at the direction of the owner. And the extra work was not done voluntarily, furnished by the contractor. And the extra work was not rendered necessary by the fault of the contractor. And this all must be proven by the plan, by clear and convincing evidence. Didn't the court rely on Carey, who was the employee, the manager of the building owner? Correct. Didn't Carey testify that, regarding the electrical wire, it was a situation that would fall within the brackets of unforeseeability and was not within the contemplation of the builder to include that in his $100,000 offer? And it was also unforeseeable with respect to the owner of the property that there might not be, in other words, the owner thought the wire was there when it wasn't. Correct. I think Mr. Carey testified that you could have tested to see if these wires were in place, but he might not have done it. And I think he testified that a reasonable contractor might not have tested for it, but it could have been tested for. But Mr. Carey did not testify to the fact that the owner agreed to pay extra for this item, that the owner believed that this was included in the general scope of $100,000. My memory of the testimony is that the contractor testified that the owner did agree to pay for the electrical wire. He had a tweet of a fact on that point. There was testimony from the contractor that the owner gave him $15,000 when that issue was brought up. There was testimony that there was a request for additional payment that by my period, and I'm quoting the record at 385 now, that with regards to the concrete work for the additional $10,000, it was discussed long after the work was completed. Okay? And in Illinois case Watson-Lumber versus Gwinnett, 5th District, 1967 states, in order to make a claim for extras, the contractor must make his claim for extras before furnishing the item. So you can't do some extra work and then come back to the owner and say, oh, I did this extra work. It cost this much. My memory of the record was the owner agreed after the window was put in, the drive-by window. He found that the sidewalk was too narrow or too small and wanted the sidewalk replaced and agreed to pay an additional amount of money for that work. It wasn't something that just fell out of the sky that the contractor did himself. And in doing, expanding the sidewalk, they ran into an unforeseen problem with metal in the concrete. And to complete the sidewalk, they had a discussion and decided that the sidewalk should be removed. Now, there might have been some type of thought in the owner's mind that the sidewalk would be done, but I think the evidence is to the contrary and Carrie's evidence is to the contrary. Well, Your Honor, I would agree with you that this issue came up during construction, that there was a problem with the sidewalk. The cars coming through a drive-thru window couldn't get close enough to the drive-thru window. And the parties did come together and agreed that the sidewalk needed to be shaved down and an issue came up with the metal plate inside the sidewalk. That all happened. But, again, the issue and appeal here is whether the owner agreed to pay extra for that item outside of the $100,000 contract prior to the work being done, which was disputed at trial by the owner. Any type of payment for this was after the work had been done. And the case law says that if you want to ask for extras and charge your owner for extras above a gross price contract, you need to discuss that before you do the work and discuss the amount, the price to do the work. In addition... Didn't these parties work together before and didn't they have an ongoing relationship that was rather informal? They did. They did. They had a relationship. They had worked together before. So why would a contractor just do this as part of the original included price as opposed to charging extra for it? Because when you make a handshake contract for $100,000 and say, I want you to rehabilitate my property, that might mean putting a sidewalk that works with the drive-thru for the price that we negotiated, $100,000. Again, the court found that the parties had different ideas of what the scope was of the contract. So did it include a proper working sidewalk that brought cars up to the drive-thru? The owner said yes. And the contractor says no. They disagreed on the scope. But things like that were unforeseeable items that came up in the future would be included in the gross price of $100,000. And that's specifically the reason why parties are encouraged to have written contracts and specific scopes of work to avoid issues like this coming up during construction. So are you saying that anything that would have come up that was unforeseen was included in the original price? If it related to getting the property operational and rehabilitating the property for business, the owner's testimony trial was those items were included in the $100,000 contract. That's what he paid for. He paid $100,000 to have the building operational and working and functional. And that's what he paid for. Your time is up. We'll have a rebuttal later. Okay. Thank you. Can you please support Corey Vazanos for pyramid development? The term extras is a term of art. Case law is developed to deal with breach of contract actions relating to construction contracts because not every detail is always found in a construction contract. So this case law has developed to weigh the owner's right to know what the owner's liabilities are before they occur and the nature, extent of his promise, and the contractor's right to payment for work that's clearly not within what was originally agreed to. Was there an architectural plan that was available to your client as provided by the Powermark? Yes. There was testimony by Mr. O'Day that this particular site, what Pyramid was tasked to do was to make the site available for temporary use. Eventually, Powermark was going to redevelop the site. It had to get approvals from the village. It had to do remediation, go through remediation relating to, I believe, underground gas tanks. And during that process, Powermark wanted to use that site for offices, its corporate offices. So my client was given one page from an architectural plan, and that one page was described the interior of the temporary offices. So it didn't have a drive-through window on it? No. I believe not. I don't believe so. And that one page was introduced into evidence, and that one page that my client was handed really was just the interior, how the walls were going to be set up for the interior build-out. Was your client to work on one building or two buildings?  As the project went on, he was on site. There was a car wash that another contractor was doing work on. However, while my client was on the site, he was asked to do other work on that other portion, the car wash. So there was the main gas station building, which was primarily where the work was done, but there was a car wash that was next to the main, main gas station building. And the car wash was not a part of the architectural plan? No. The plan that he received was really just one page, and it was pretty much a rectangle with where the walls would be. And the balance of the $100,000 agreement that came to result also from a walk-through of the site and discussion between the two, what was to be done? Correct. The parties walked through the site, my client had the page, then they met. Well, my client actually emailed Mr. O'Day, I'm going to do this for $117,000. $117,000. $117,000. They met, talked about it, my client was persuaded to come down, and without any discussion really of expanding that scope. What's our standard of review on this case? I believe the standard of review is because this is an oral agreement, the terms and intent of the parties are questions of fact, and therefore it's whether the trial court's decision was against the manifest weight of the evidence. And as I look at the Anderson case, I see that against the manifest weight of the evidence, a ruling would be against the manifest weight of the evidence if an opposite conclusion is clearly evident, or if the ruling was arbitrary, unreasonable, or not based on sufficient evidence. So I think much discretion is given to the trial court. She heard a day and a half of testimony. The trial court was able to listen to the witnesses, look at their demeanor, and weigh the evidence. So regardless of whether we look at the case law regarding extras, whether extras are recoverable, or if we just look at case law regarding whether there's an enforceable contract, I think under either set of case law, there definitely was an agreement that Pyramid was to be paid for some of this work. Some of this work that the judge ruled Pyramid should be paid for wasn't even discussed or what didn't even exist when the parties met back in October. For example, the insulation that was to be added to create additional privacy and keep the Secretary's section warm. Is this all on the record? Yes, it's all on the record, yes. And I think in my brief, I break down each of the extras, and I break down who testified as to the agreement, the price of the extras. So they were discussed, and it is in the record, yes. Well, if we could look at that architectural drawing of the interior of the building, would we see electrical? Would we see a sidewalk outside? Would we see, what else, insulation in the building? Would there be any specs for that? No, and as I look at the exhibit list, it's not attached as part of the appendix, but it is really just one page, and that will not be. I'm trying to find the exact exhibit number for it. I'm sorry, I can't locate it right now. And of course, Pyramid did agree to do a few things that weren't on that one-page plan. They were going to do some patchwork landscaping. If there were holes in the landscaping, they were going to put some sod on there. There was an exterior canopy that was removed, and there were holes in the ground as a result of that. And Pyramid said they'd patch that and then kind of cover the entire parking lot with asphalt and a seal coat so it would look new and fresh. So there were some minor things that were outside that Pyramid had to agree to. What about this, for lack of a better term, I'll call it the second agreement, or maybe even the third agreement, where your client redid some figures and gave a credit for $10,000 in anticipation of the check? What is the status of that in this whole? Well, I think that there's a unique – there's a lot of bargaining. Mr. O'Day, my client's testimony is that Mr. O'Day, the principal of Power Mart, likes to feel like he's getting a bargain. And Mike Carey told my client, look, you'll get your final payment, but you have to show Sam that he's getting something for nothing. Sam likes to feel like he's getting a bargain. He likes to feel like he's sort of, you know, getting his way. So my client listed all of those things that he had done, and there was testimony that he had discussed the price, there was an agreement to pay, but he had not yet invoiced Power Mart. So my client sent the email at the request of Mike Carey saying, look, Sam, look at all these things that I did that I have not invoiced you. And my client sent that email because Mike Carey said, you know, send that, I'll have a check ready for you, you know, but I'll have this check ready for you, but you've got to, you know, let Sam feel like he's getting a deal. Well, did Mr. Carey have the authority to make that representation? Mr. Carey, I don't know that there was testimony that he did not. There was testimony that he was the agent of Power Mart. I mean, I think, well, this would really be my speculation, but Mr. Carey was familiar with the way Mr. O'Day operated because he's worked for Mr. O'Day for other projects. So I think that that was just, whether he actually had authority, I don't believe there's anything in the record that Mr. Carey actually was doing that, you know, with express authority from Mr. O'Day. Didn't the court rely heavily on Mr. Carey's testimony regarding the outcome of this case and the numbers? Yes, of course, because there were really only three witnesses. One witness was Sam O'Day of Power Mart and the other witness was Rami Saif of Pyramid. So Mike Carey was essentially the most impartial. And in addition to that, she obviously saw his demeanor on the stand and felt him to be quite credible. Yes. Anything else? I don't think I have much. Well, I do want to make one point. We did present our motion for leave to amend at the beginning of the second day of trial before plaintiff rested. Judge, I handed a copy of our motion with the handwritten changes to the math, and Judge Wheaton said that she would want to address it later. So I believe that it might not – the wrong impression might be made in Power Mart's brief that it wasn't presented until the close of evidence. It was ruled upon after the close of evidence, but it was presented beforehand, and there was plenty of opportunity for cross-examination. But other than that, I don't have anything else to add. Thank you. Thank you. We'll hurry, Bob. To address a prior question of the court, looking at the two competing specifications, which do appear in the record, and A53, which is Pyramid's specification, and A57, if you look at Pyramid's, all it says is electrical work and lighting. That's all the detail it has in here, $35,000. If you look at Power Mart's, which is a little more specific, it says reinstall and connect all utilities to both buildings according to Downer's code of approval and operation. So this is what we're dealing with, very ambiguous, one-line items about electrical work being done. And as such, the court agreed – the two parties did not agree on the scope of that work. In addition, there is a full set of architectural plans that were presented as evidence at the trial court, which is attached as Defendant Exhibit 5 to the exhibits from the trial. And there's a complete set of plans that were necessary and specifications to construct the premises. It's undisputed that although Pyramid claims they used a one-page floor plan to construct the premises, it is undisputed that they agreed to do work outside of the property as far as on the sidewalk and concrete. Even in their proposal, it says remove broken concrete, minor landscaping. So all the work did not only take place inside the building. There was work agreed to and undisputed to be taking place outside of the property and in both the Car Wash building and the Mini Mart building. To rebut the final issue on the medical complaint, Your Honor, the second medical complaint was presented after Pyramid's member had already testified and been cross-examined. There was no opportunity to reexamine Mr. Safe or Pyramid on those extras that were added on the 12th hour to the prejudice and surprise of the appellant. The appellant had no opportunity whatsoever to ask questions about that, to conduct discovery. And the Illinois law permits liberal amendments to pleadings, however, not when there's surprise and prejudice to the other party. And therefore, we respectfully request that this court reverse the trial court's judgment order. Thank you. You couldn't have called the contractor as an adverse witness after the medical complaint? The medical complaint was not given leave to be filed until the trial was over. So it wasn't – there was no need to even question a witness on it. It wasn't even a record at that time. We know it was a pending motion. But we objected to it. We didn't think there was a possibility to be granted. We thought that it was – it should be granted. It was at the 11th hour. We objected to it. We told the judge that it added additional items that they knew about for months prior to the trial that should not have been added. We did not believe that it was going to be entered, given leave to have it filed. And it was filed at the very end after the trial court read its opinion. But by the time of the trial, did your client actually have the benefit of the work that was identified in that amended complaint? Again, I don't think there's any dispute that that work was done. The work was completed. Correct. The dispute is whether the owner agreed to pay action for that work, Your Honor. And if there's no other questions, I have nothing further. Thank you. Thank you. All right. The case is taken under 5-0.